UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CHRIS LANGER,

                Plaintiff,

          v.

MILAN KISER, in individual and representative capacity as trustee of the Milan and Diana Kiser Revocable Trust dated August 19, 2003; DIANA KISER, in individual and representative capacity as trustee of the Milan and Diana Kiser Revocable Trust dated August 19, 2003,

                Defendants.

) Case No.: 3:18-cv-00195-BEN-NLS
)
)
) **FINDINGS OF FACT, CONCLUSIONS**
) **OF LAW, AND ORDER OF DISMISSAL**
)
)
)
)
)
)
)
)
)
)

## I.   <u>INTRODUCTION</u>

Plaintiff Chris Langer ("Plaintiff") brings this action under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et. seq.* (the "ADA"), and California's Unruh Civil Rights Act, CAL. CIV. CODE, §§ 51-53 (the "UCRA"), against Defendants Milan and Diana Kiser, as individuals and in their representative capacities as trustees of the Milan and Diana Kiser Revocable Trust dated August 19, 2003 (collectively, "Defendants") for discrimination by failing to provide full and equal access to the parking lot they own that Plaintiff was unable to access due to his disabilities. Complaint, ECF No. 1 ("Compl."). Defendants counterclaimed for trespass. Answer

-1-

and Counterclaim, ECF No. 20.  Plaintiff tried his claims to the Court without a jury on September 30, 2020.  Minute Order, ECF No. 84.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, these findings of fact, conclusions of law, and order constitute the Court's final decision with respect to the bench trial it conducted on Plaintiff's claims against Defendants and are based on the testimony at trial, exhibits admitted into evidence, arguments of counsel, and entire record in this case.  The Court finds that while Plaintiff has Article III standing, the subject property (a private parking lot) was not a place of public accommodation, and the owners of the property did not discriminate against Plaintiff by failing to offer an ADA-complaint place to park his vehicle.  These findings of fact and conclusions of law are outlined below.

## II.  FINDINGS OF FACT

### A.  Stipulations

At the beginning of trial, the parties stipulated that:

1.     Defendants are the trustees of the Milan and Diana Kiser Revocable Trust, which owns the mixed-use real property located at 3002 Barnett Avenue, San Diego, California 92110 (the "Property"), and owned the Property in this capacity in 2017.  Trial Trans. ("Tr.") at 3:12-14, 96:4-8; *see also* Defendants' Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 25 at 3:8-11.

2.     Even though Plaintiff's complaint in this case made allegations of barriers to access against both the 1 Stop Smoke Shop (the "Smoke Shop") and Gour Maine Lobster shop/Wallpaper store (the "Lobster Shop"), Plaintiff is not pursuing any violations against the Smoke Shop and is limiting his case to proving there was no van accessible parking at the Lobster Shop.  Tr. at 2:7-10.

3.     Plaintiff took 52 photographs on September 19, 2017.  Tr. at 27:18-19.

4.     Plaintiff has filed close to 2,000 ADA cases.  Tr. at 46:5-47:12.

### B.  Findings of Fact

After considering the testimony, evidence, and record, the Courts finds the

-2-

following facts:

1.  On September 19, 2017, the day that Plaintiff visited the Property:

    a.  Defendants owned the Property, which is a mixed-use property.

    b.  The Property includes an East Lot and West Lot, as defined below.

    c.  Defendants leased the Property to residential and commercial tenants.

    d.  Mr. Taylor leased space from Defendants for his business, the Lobster Shop, and his wife's business, Gael's Wallpaper, pursuant to a lease agreement.

    e.  Defendants did not offer parking in the East Lot to anyone other than their tenants as indicated by the (1) lack of signs advertising that vehicles driving by should enter and park inside the East Lot; (2) two signs on each side of the gate to the East Lot, stating that open public parking was prohibited; (3) numerous signs inside the East Lot, stating that parking was for tenants; and (4) numbers on each space, indicating each space was assigned.

    f.  Under the lease agreement between Defendants and Mr. Taylor, Mr. Taylor was allocated parking space number one, which was for his use and not the use of guests or customers.

    g.  Plaintiff saw the signs prohibiting public parking on the gate to the East Lot as he drove through the gate providing access to the East Lot.

    h.  The arrow on the sign within the East Lot that said "Parking" above the word "Lobster" is pointing down and to the left and does not indicate that customers should park directly in front of the sign.

    i.  The East Lot had one designated handicap parking spot, which did not include a handicap access aisle to its right.

    j.  The Lobster Shop offered parking to its customers, and this one parking spot (parking space number one) was not a handicap parking space.

    k.  Plaintiff never parked in parking space number one or entered the Lobster Shop store front.

2.  The East Lot now has one handicap spot, which includes a handicap access

-3-

1    aisle to the right of the handicap spot.

2        **3.**       The Lobster Shop no longer allows its parking space to be used by

3    customers.  Plaintiff's Post-Trial Brief, ECF No. 86 at 2:10-11; *see also* Tr. at 78:2-79:1.

4        **C.**       **Observations and Analysis**

5            **1.**    ***The Property***

6        Defendants' Property has parking lots located on each side of the building.  Tr. at

7    21:12-19.  The lot on the west side (the "West Lot") is leased to an auto repair shop.

8    Declaration of Milan Kiser in Support of Defendants' Opposition to Plaintiff's Motion

9    for Summary Judgment ("Kiser Decl."), ECF No. 25-1 at 3:6-7; *see also* Exhibit 4 to

10   Declaration of Russell Handy in Support of Plaintiff's Special Motion to Strike, ECF No.

11   21-5 at 1.  The lot on the east side of the Property is for use by Defendants' residential

12   tenants (the "East Lot"), and the owner of the Lobster Shop has one space for personal

13   use.  Tr. at 90:2-4, 96:22-25, 98:5-7; Kiser Decl. at 2:13-15.  The East Lot is enclosed by

14   a gate that, as shown below in the photograph taken by Plaintiff on the day he attempted

15   to access the Property, had four signs on the gate.



*See* Trial Exhibit 10.

28       Two of the signs on each side of the gate at the entrance to the East Lot prohibit

-4-

1  open public parking (the "No Public Parking Signs")[1], stating as follows:

2        OPEN PUBLIC PARKING PROHIBITED
3        NO TRESPASSING PC 602 (M) (N)[2]
      ALL UNAUTHORIZED VEHICLES WILL BE TOWED
4        AT VEHICLE OWNER'S EXPENSE
      C.V. 22658A      SDPD 619-531-2000
5        FOR INFORMATION STAR TOWING 858-573-8700.

6  *See also* Tr. at 41:17-23.

7        **2.**     ***Plaintiff Chris Langer's Visit to the Property***

8        Plaintiff is a paraplegic who has been disabled since 1983, is unable to walk, and

9  requires a wheelchair device to ambulate.  Tr. at 6:11-21; *see also* Declaration of Chris

10  Langer in Support of Plaintiff's Motion for Summary Judgment, ECF No. 24-2 ("Langer

11  MSJ Decl.") at 1:24.  He has a disabled person parking placard and a specially equipped

12  van with a ramp that deploys out of the passenger side.  Tr. at 10:8-14; *see also* Compl.

13  at 2:6-9.

14        Plaintiff is familiar with Defendants' Property.  Tr. at 6:22-24.  On September 19,

15  2017,[3] Plaintiff went to the Property for the purpose of purchasing lobster.  *Id.* at 7:4-13;

16

17  ---
[1]    Title III of the ADA's prohibition against discrimination only applies to a person
18  "who owns, leases (or leases to), or operates a place of public accommodation."  42
U.S.C. § 12182(a).
19  [2]    California Penal Code, Section 602(m) provides that "every person who willfully
20  commits a trespass . . . is guilty of a misdemeanor" and defines a trespass as "[e]ntering
and occupying real property or structures of any kind without the consent of the owner,
21  the owner's agent, or the person in lawful possession."  Subsection (n) defines a trespass
22  as "[d]riving any vehicle . . . upon real property belonging to, or lawfully occupied by,
another and known not to be open to the general public, without the consent of the owner,
23  the owner's agent, or the person in lawful possession."  CAL. PEN. CODE, § 602(n).
24  [3]    At trial, Plaintiff testified that he visited the Property on September 19, 2017.  Tr.
at 7:4-13; 20:16-19.  However, in Mr. Langer's declaration submitted in support of his
25  Motion for Summary Judgment, which he signed under penalty of perjury, he stated, "On
26  February 27, 2017, I went to the 1 Stop Smoke Shop . . . and Gour Maine Lobster."
Langer MSJ Decl. at 1-2, ¶ 4.  Yet, the complaint refers to Plaintiff visiting in September
27  2017.  Compl. at 4, ¶ 14.  This inconsistency in Plaintiff's testimony factored into the
28  Court's consideration with respect to Plaintiff's credibility.

20:16-19.  He was traveling South on Rosecrans Street, made a left turn onto Lytton Street, and headed towards the Lobster Shop, a business located on the Property.  *Id.* at 24:7-15.  In this direction of travel, he saw the Lobster Shop's sign on the exterior of the front gate, advertising for live lobster:



Plaintiff's Trial Exhibit 4-A (the "Live Maine Lobster Sign").

In order to enter the East Lot from this direction of travel, Plaintiff would have needed to make a left turn into the East Lot.  *Id.* at 24:16-25:7.  Because the East Lot cannot be accessed by making a left turn from his direction of travel, he continued down Lytton Street until it became Barnett Avenue, made a legal U-turn, and approached the Lobster Shop from the other direction.  *Id.* at 24:16-25:7.  As Plaintiff drove in this direction, he would have passed a sign saying, "Park in the Alley" with lobsters on it before reaching the gate providing access to the East Lot.  *See* Trial Exhibit 6M.

As an individual approaches the Lobster Shop in a vehicle, there are no signs on the exterior of the East Lot that indicate parking for the Lobster Shop is allowed inside the East Lot.  Tr. at 32:14-23.  Further, just before entering the East Lot by making a right turn into the lot, Plaintiff saw the open sliding gate, which had four signs on it, including the Live Maine Lobster Sign as well as the two No Public Parking Signs, which were not obscured.  *Id.* at 25:13-26:1.  Nonetheless, he turned right into the East Lot and saw a sign inside the East Lot that said, "Live Lobster" with "Parking" and an arrow above it.  *Id.* at 63:13-18; 65:22-25.

1
2
3
4
5
6
7
8



9   Plaintiff's Trial Exhibit 4P (the "Lobster Parking Sign"). Plaintiff testified that the arrow

10 points to the parking spot directly in front of the Lobster Shop. Tr. at 72:14-18.

11 However, he also testified that the arrow points to the left and down. *Id.* at 73:1-3. The

12 Court finds that the arrow points to the left and does not indicate that someone should

13 park in the spot directly in front of the sign.

14     Both of the No Public Parking Signs, which were on the same fence as the Live

15 Maine Lobster Sign, were visible on each side of the gate as Plaintiff drove through the

16 gate. Tr. at 19:14-20:3; 31:2425; 32:21-23, 41:17-23. However, Plaintiff saw the Live

17 Maine Lobster Sign as well as the Lobster Parking Sign[4] inside the East Lot, and based

18 on those two signs as well as the business being open to the public, believed he could

19 park in the East Lot inside the fence even though there was nothing on the exterior signs

20 that said parking was permitted inside the fence.[5] *Id.* at 13:4-10, 18:7-19:13.

21

22 [4]     Plaintiff had conflicting testimony about whether he saw the Lobster Parking Sign

23 from the street **before** he entered the East Lot. *Compare* Tr. at 13:4-10 (testifying he
saw the Lobster Parking sign on the day of his visit) *with id.* at 35:1-22 (testifying that

24 he may not have seen the Lobster Parking Sign on his first pass, and that "[i]t may have
been on the second pass, but that sign could clearly be seen from the street.").

25 [5]     Plaintiff testified that he interpreted the words "OPEN PUBLIC PARKING

26 PROHIBITED" on the No Public Parking Signs to mean that the general public could
not park there, but customers of the businesses at the Property could. Tr. at 65:13-14.

27 He stated that the "open" sign was lit up in the window of the Lobster Shop, and that the

28 illuminated sign in addition to the Lobster Parking Sign led him to believe the Lobster

1   Accordingly, Plaintiff entered the East Lot from the street by turning right into the front
2   gate and testified that even though No Public Parking signs were visible as he was driving
3   into the gate, he did not see them. *Id.* at 13:19-25, 19:14-2:3.  Plaintiff testified that there
4   was nothing on the store front itself that said parking was available in the adjacent lot.
5   *Id.* at 19:6-9.  He also stated that there were signs up against the fence inside the East Lot
6   that said "something to the effect of tenant parking only." *Id.* at 20:16-21:2.

7       Once Plaintiff pulled into the East Lot, he observed there was, in fact, a
8   handicapped space, it lacked an "access aisle" to the right of the space, which is required
9   for him to use the space.  Tr. at 10:2-14; *see also id.* at 15:14-15.  In order for Plaintiff to
10   use a handicapped space, the space must have an access aisle to the right of the
11   handicapped space so he can deploy the ramp in his van out the side, which allows him
12   to safely exit and re-enter the vehicle.  *Id.* at 10:2-14.  Such ramps are generally eight
13   feet wide.  *Id.* at 15:8-10.  Plaintiff testified that the location of the white car in Plaintiff's
14   Trial Exhibit 5V is where the handicap aisle would usually be located.  *Id.* at 11:17-20.
15   Plaintiff's Trial Exhibit 5V, as depicted below, shows the available handicap stall
16   Plaintiff encountered on the day of his visit:



26   Plaintiff's Exhibit 5V; *see also* Tr. at 11:14-15.

28   Shop was open for business.  *Id.* 65:22-66:25.

-8-

Plaintiff explained that when he is not in his vehicle, the van ramp is not deployed to block someone from parking next to his car.  Tr. at 16:19-24.  As a result, someone can park in the space to his right, and then, when he returns to his vehicle, his access to the vehicle is obstructed.  *Id.* at 16:19-24.  Consequently, if there is no access aisle, even if there is an open parking spot next to the disabled stall, Plaintiff cannot simply use the open parking space as an access aisle because if someone parked in that space while he was inside a business, when he returned to his vehicle, the parked vehicle would prevent him from deploying the ramp in his van, which would prevent him from entering his vehicle.  *Id.* at 15:17-16:15.  In order to re-enter his van, Plaintiff would need to locate the owner of the vehicle and ask him or her to move the vehicle.  *Id.* at 16:14-15.

Once Plaintiff saw there was no handicap access aisle next to the handicap spot, he did not make any effort to contact anybody to see where available parking was.  Tr. at 44:4-7.  He also did not go inside the business.  *Id.* at 17:7-10.  However, he had a camera with him,[6] which he used to take pictures of the Property.  Tr. at 44:23-25.

Plaintiff has not been back to the Lobster Shop since September 2017 and has never been inside the business.  Tr. at 41:24-42:1.  However, he drove by Defendants' Property the night before trial and noticed that the gate to the East Lot is closed now.  *Id.* at 42:4-10.

On the day Plaintiff filed this lawsuit, he filed six additional lawsuits in the Southern District of California also alleging ADA violations.[7]  Tr. at 50:3-51:25.  These lawsuits pertained to the below six cases: (1) *Langer v. Yee*, Case No. 18-cv-00190-H-NLS; (2) *Langer v. Little*, Case No. 18-cv-00191-BEN-JMA; (3) *Langer v. Chula Vista*

---

6  He had the camera with him because he keeps one in his car at all times, which he uses for both personal recreational use as well as for lawsuits.  *Id.* at 44:23-45:14.  Whenever Plaintiff comes across a place he believes has ADA violations, he takes pictures to document the condition of the premises on that date and time.  *Id.* at 67:4-18.

7  At trial, the Court permitted Defendants to question Plaintiff about these lawsuits, finding them relevant to the issue of the legitimacy of his professed intent to return, which as discussed below, is relevant to standing in this case.

*Rentals, LLC*, Case No. 18-cv-00192-BEN-JLB; (4) *Langer v. Slat Salt, Inc.*, Case No. 18-cv-00193-BEN-MDD; (5) *Langer v. US Bank, N.A.*, Case No. 18-cv-00194-L-WVG; and (6) *Langer v. Lamp Farms, LLC*, Case No. 18-cv-00209-MMA-BGC. *Id.* at 49:1-59:5. As to the first lawsuit, *Langer v. Yee*, Plaintiff alleged in the complaint that he went to the May Center in 2017 and encountered barriers to access, but at trial, when asked about kind of business the May Center was, could not recall. *Id.* at 52:16-20. As to the second lawsuit, *Langer v. Little*, Plaintiff testified that one of the defendants, Cal Auctions, LLC, is an auction house he does business with by attending their auctions and buying products. Tr. at 57:1-12. However, at trial, he could not recall what items he was picking up in November 2017 when he alleges he visited that property. *Id.* at 57:21-24.

Plaintiff testified he would return to the Lobster Shop if it had handicapped parking because he likes lobster. Tr. at 68:6-10; 69:1-5. He stated he purchases lobster all the time and had just gotten a "big lot from Costco," which delivers so he does not have to go into the store. *Id.* at 68:12-14.

### 3. *David Taylor*

David Taylor ("Mr. Taylor") owns the Lobster Shop, which he has owned for twelve (12) years. Tr. at 74:16-77:3. However, he has only leased space at the Property from Defendants for four years. *Id.* at 75:5. On July 3, 2016, Mr. Taylor and his wife, Gael Taylor, moved their businesses to the Property and entered into a Rental Agreement and/or Lease with Mr. Kiser (the "Lease Agreement"), which governs the terms of his tenancy. *Id.* at 75:5-9; 88:9-22; 96:15-18. Page 1, Section 8 of the Lease Agreement covers parking and assigns Mr. Taylor one space:

> When and if RESIDENT is assigned a parking space on OWNER'S property, the parking space shall be used exclusively for parking of passenger automobiles and/or those approved vehicles listed on RESIDENT's 'Application to Rent/Lease' or attached hereto. RESIDENT is hereby assigned parking space ONE. Said Space shall not be used for the washing, painting, or repair of vehicles. No other parking space shall be used by RESIDENT ~~or his guests~~.

-10-

Tr. 89:6-17; *see also* Trial Ex. 17 (strikethrough in original exhibit).

Paragraph 8 of the Lease Agreement says nothing about customer parking.  Tr. at 90:2-4.  Originally, Mr. Taylor understood that either he or his customers could park there if a space was available.  *Id.* at 93:21-25.  Mr. Taylor testified that the words "or his guests" was not scratched out after the signing of the Lease Agreement but rather was that way at the time he signed the Lease Agreement.  *Id.* at 90:19-20.

Mr. Taylor testified that while his business is on Barnett Avenue, there is no street parking on Barnett Avenue.  Tr. at 77:2-10.  He stated that he installed the Lobster Parking Sign in between parking stalls 1 and 2 to show customers where the store is, where to go, and where to park.  *Id.* at 76:3-18.  According to him, the arrow at the top of the sign that said "PARKING" was pointing down and to the left rather than to the street to indicate that people should park on the street.  *Id.* at 77:14-24.  Once Mr. Kiser saw the Lobster Parking Sign, he asked Mr. Taylor to remove it.  *Id.* at 91:16-23.  Mr. Taylor, however, did not remove the sign but rather changed it by removing the portion of the sign that said "Parking" from the top of the sign.  *Id.*

Mr. Taylor testified that in 2017, the front gate to the East Lot was open all the time, and it was common for customers to pull into East Lot and park if there were available parking spots.  Tr. at 78:23-79:8, 81:8-9.  During that time, he stated he had two spots available for customers,[8] and they could use either the East Lot by parking in spot number one or twenty-two on the other side of the lot.  *Id.* at 78:4-12; 79:9-11, 82:1-16.  He testified that on the day Plaintiff took his photograph on September 19, 2017, a customer would not have been trespassing if he parked in parking space number one.  *Id.* at 82:18-24.

---

[8]   Even if non-tenants or customers occasionally parked in the East Lot, under the law, such "occasional use" of an otherwise private facility does not convert that facility into a public accommodation under the ADA.  *Jankey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 2d 1174, 1178 (C.D. Cal. 1998), *aff'd* 212 F.3d 1159 (9th Cir. 2000) (affirming that Title III only applies to establishments open to the public at large).

1    At some point after the lawsuit was filed, Defendants installed a new gate and

2    started locking that gate on a regular basis.  Tr. at 80:20; 81:2-7.  Once Defendants started

3    locking the gate to the East Lot, customers would have to enter from the back gate, where

4    there is a sign that says employees, workers, tenants only.  *Id.* at 81:17-22.  Now, his

5    customers cannot use the East Lot for parking.  *Id.* at 77:25-79:1, 81:23- 82: 14.

6    ### 4.    ***Milan Kiser***

7    Mr. Kiser and his wife are the owners of the Property.  Tr. 96:4-8; *see also*

8    Defendants' Post-Trial Brief, ECF No. 91 ("Def. Brief") at 2:14-15.  In 2016, when Mr.

9    Kiser entered into the Lease Agreement with Mr. Taylor, he had a conversation with him

10   discussing the terms of the Lease Agreement, and this conversation covered the issue of

11   parking.  *Id.* at 105:10-16.  He explained to Mr. Taylor that the East Lot is not for the

12   public, and Mr. Taylor responded to Mr. Kiser that they do business through the phone

13   (insinuating that they would not have much need for public parking).  *Id.* at 105:19-23.

14   Under the Lease Agreement, Mr. Kiser assigned Mr. Taylor one parking space in

15   the East Lot: space number one.  Tr. 96:22-97:2.  Mr. Kiser stated that the East Lot has

16   about twenty (20) parking spaces, and all of the spots are for residential tenants only.  *Id.*

17   at 97:3-13.  Some tenants have one spot, while others have two spots; however, all of the

18   parking spaces are occupied.  *Id.* 97:8-13.

19   Mr. Kiser testified that he never told Mr. Taylor that he could have his customers

20   park in the East Lot.  Tr. 97:22-24; 98:5-7.  Occasionally, Mr. Taylor's wife or daughter

21   would park there, and Mr. Kiser would not say anything because there was an available

22   space, so he would turn a blind eye to the issue because it was not impacting parking for

23   other tenants.  *Id.* at 97:24-98:7.  However, this did not change the fact that the East Lot

24   is for tenant use only.  Tr. at 99:16-18.  Because Mr. Kiser never authorized Mr. Taylor

25   to put the Lobster Parking Sign up, he asked them to remove it as soon as he became

26   aware of it.  *Id.* at 100:17-23.  He stated that by putting up that sign up or letting customers

27   park in the East Lot, Mr. Taylor violated the Lease Agreement.  *Id.* at 102:6-9.

28   With respect to the installation of a new gate and closing of the gate after the filing

-12-

of this lawsuit, Mr. Kiser testified he installed a new gate after there was an accident in which someone drove into and destroyed half of the fence to the East Lot. Tr. at 109:3-15. Mr. Taylor approached Mr. Kiser about how dangerous the turn into the East Lot is when someone is approaching from the East, so Mr. Kiser decided to close that gate and received praise from his tenants, including Mr. Taylor, for doing so. *Id.* at 109:15-24.

### 5. *Post-Suit Remediation of the Alleged Barriers*

Although neither party addressed this issue at trial, the record indicates that since this lawsuit was filed, Defendants installed a handicap access aisle in the East Lot to the right of the handicap spot:



Sep 10, 2018 4:16:13 PM

Declaration of Zion Sapien in Support of Plaintiff's Motion for Summary Judgment, ECF No. 24-7 ("Sapien Decl.") at 4[9]; *but compare* Tr. at 126:8-9 (referring to whether the

---

[9]     Although Mr. Zapien did not testify at trial, and the photograph of the remedied parking space was not discussed or identified for admission into evidence at trial, the Court, in its findings of fact and conclusions of law, must consider the entire record in this case. *See, e.g.*, *Cox v. Ametek, Inc.*, No. 317CV00597GPCAGS, 2020 WL 7353425, at *1 (S.D. Cal. Dec. 15, 2020) (Burns, J.) (considering in its findings of fact and conclusions of law "[t]he entire record in this proceeding, including but not limited to the briefing, declarations, and exhibits submitted in support of preliminary approval of the Settlement in its various iterations"); *Odyssey Reinsurance Co. v. Nagby*, No. 316CV03038BTMWVG, 2020 WL 6336331, at *1 (S.D. Cal. Oct. 29, 2020) (Moskowitz, J.) (entering findings of fact and conclusions of law after considering the

-13-

Property had changed, Milan Kiser testified, "It's the same thing, the way it was in 2017") *with* Tr. at 109:5-24 (referring to whether Mr. Kiser had changed the Property, Mr. Kiser testified that he installed a new gate at the Property after an accident, which he now keeps closed).  This photograph was already submitted to the Court as evidence in support of Plaintiff's Motion for Summary Judgment and also relied upon by the Court in denying summary judgment.  *See* Order, ECF No. 46 ("Plaintiff also provides photos taken by his investigators Evan Louis on December 20, 2017, and Zion Sapien on September 10, 2018, of Defendants' Property, all purporting to show that both parking lots lacked ADA complaint parking spaces") (citing ECF No. 24); *see also* Sapien Decl., ECF No. 24-6 at 2, ¶¶ 3-5 (declaring that "[o]n September 10, 2018, I conducted an investigation of the businesses," and "[i]n the Lobster Shop parking lot, there was one parking space reserved for persons for disabilities with an adjacent access aisle").

### D.   <u>Analysis</u>

The Court finds Plaintiff's testimony to be unreliable.  Frequently, he could not recall important details, and his testimony was delivered in a rote fashion, as if it had been rehearsed.  Further, Plaintiff's counsel appeared to be visibly coaching Plaintiff

---

moving papers, arguments of counsel, and entire record in the case); *N.L.R.B. v. Serv. Employees Union Local 77, Serv. Employees Int'l Union, AFL-CIO*, No. 83-7193, 1986 WL 236051, at *3 (9th Cir. Nov. 25, 1986) (making findings of fact and conclusions of law, based upon the entire record, including a special master's report and the observations of witnesses); *In re Jaques*, 615 B.R. 608, 614 (Bankr. D. Idaho 2020) (considering the evidence admitted at trial, the parties' closing arguments, and taking judicial notice of the Court's files in the court's findings of fact and conclusions of law).  Further, the Court may take judicial notice of its own records and files.  *See, e.g.*, Fed. R. Evid. 201(b)(1)-(2) (providing that at any stage of a proceeding, courts may take judicial notice of (1) facts not subject to reasonable dispute and "generally known within the trial court's territorial jurisdiction" and (2) adjudicative facts, which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290, fn. 1 (9th Cir. 1996) (taking judicial notice of court records); *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 746 (8th Cir. 1996) (holding that the district court did not err by taking judicial notice of pleadings in earlier related proceedings).

during cross-examination by opposing counsel.  *See* Tr. at 53:20-24.   On direct examination, Mr. Langer appeared confident in reciting the salient events giving rise to his claims, including his protested taste for lobster.  *Id.* at 68:9-10.  He testified without noticeable reflection, proceeding in a narrative fashion, without requiring questions to prompt him.  *Id.* at 6-17.  When cross-examined, however, Mr. Langer's confidence decreased, and he peppered his testimony with professions of uncertainty, lack of knowledge, or an inability to recall.  *Id.* at 17-58.  At times, Mr. Langer's testimony was entirely inconsistent.  *Compare* Tr. at 24:5-6 ("I don't recall when I saw the sign [the Lobster Parking Sign]") and *id.* at 36:2-3 (same) *with id.* at 35:1-4 (answering "Yes," when asked "So . . . as you were driving down the street, you saw the sign [the Lobster Parking Sign]?").  For example, Plaintiff testified he was unable to recall when he first saw the Live Lobster Sign.  Tr. at 24:5-6.  However, if he did not see it before entering the East Lot, his entire reason for entering the East Lot (e.g., seeing a sign advertising parking) falls apart.

The Court further finds that Plaintiff's decision to only pursue claims pertaining to the Lobster Shop, foregoing any claims as to the Smoke Shop, including those within the store, directly undercuts his credibility with respect to having a legitimate intent to return to the Property.  *See, e.g.*, Tr. at 68:6-8 (answering "yes" when asked, "If they were to fix the parking and have a van accessible parking would you go back"); Compl. at 5, ¶ 37 ("Plaintiff would like to return and patronize the 1 Stop Smoke Shop and Gour Maine Lobster but will be deterred from visiting until the defendants cure the violations").  Plaintiff's complaint originally took issue with the many barriers inside both the Smoke Shop and Lobster Shop, which were described due to the investigation of a private investigator given Plaintiff never entered the store.  *See* Order, ECF No. 46; Compl. at 5, ¶¶ 31, 34 (pleading that the Lobster Shop lacked paths of travel that were not wide enough while the Smoke Shop lacked a lowered, 36-inch transaction counter).  If Plaintiff truly desired to make the premises handicap accessible for others as well as himself, he would not have foregone claims pertaining to the Smoke Shop or the claims

-15-

relating to the counter heights within both stores given he alleged an intent to return to both stores in his complaint and motion *in limine* prior to trial.  Compl. at 6, ¶ 37; *see also* Motion *in Limine*, ECF No. 65-1 at 8:16-17 ("Mr. Langer maintains that he did in fact go to the Smoke Shop and Lobster Shop with the intent to shop").

For example, prior to trial, Plaintiff never alleged that he smoked, and as such, a legitimate intent to return to the Smoke Shop would be suspect absent testimony at trial regarding Plaintiff's interest in smoking.[10]  Not surprisingly, at the beginning of trial, Plaintiff stipulated to foregoing the claims relating to the Smoke Shop—directly undercutting his allegations in the complaint of having a legitimate intent to return there. *Compare* Tr. at 2:7-10 ("We're not going to pursue any remedies or violations regarding No. 1 Smoke Shop") *with* Compl. at 6, ¶ 37 ("Plaintiff would like to return and patronize the 1 Stop Smoke Shop and Gour Maine Lobster").  As to the Lobster Shop, Plaintiff testified he likes lobster.  Tr. at 7:8-13.  Yet, this testimony represents a prime example of the rehearsed nature of Plaintiff's testimony.  He also testified he had driven by the premises four to five times, including the night prior to trial.  *Compare* Tr. at 42:4-16 *with Harris v. Stonecrest Care Auto Center, LLC*, 472 F. Supp. 2d 1208, 1211, 1216 (S.D. Cal. 2007) (Burns, J.) (noting that courts must not consider post-filing visits to a defendant's business as establishing likelihood of return and declining to consider Plaintiff's post-filing visits to the defendant's Shell station or nearby attractions when examining whether Plaintiff was likely to return).

Plaintiff had the burden of proof at trial.  On the one hand, when asked directly, "If they were to fix the parking and have a van accessible parking[,] would you go back?," Plaintiff responded, "Yes.  Absolutely."  Tr. at 68:6-8.  On the other hand, Plaintiff also testified that he "purchase[s] lobster all the time," *id.* at 68:12, and that he recently

---

[10]     During trial, Defendants' counsel also questioned Plaintiff regarding another lawsuit he filed against a marijuana dispensary, of which the Court took judicial notice at trial, but Plaintiff was unable to recall anything from personal knowledge regarding the lawsuit.  *See* Tr. at 58:2-59:5; *see also* Trial Exhibit 38 at 3, ¶¶ 8-9 (alleging Plaintiff went to a dispensary in November 2017, which also lacked handicap accessible parking).

purchased a "big lot from Costco, and luckily they deliver," so he does not have to go into Costco, *id.* at 68:12-14.   Absent testimony regarding where Plaintiff lives[11] or whether the Lobster Shop has better prices than Costco, which delivers to him, the Court finds it doubtful that Plaintiff would frequently travel to the Property to purchase lobster, as he testified.   This is bolstered by the fact Plaintiff has filed previous lawsuits in which he admits he never intended to return to the premises.   *See*, *e.g.*, *Langer v. Lapiz Properties Group*, Case No. 3:20-cv-0664-BEN-MDD[12] (the "*Lapiz* Case"); *see also* Order, ECF No. 46 (taking judicial notice of the fact that Plaintiff admitted in the *Lapiz* Case that he did not intend to return to the premises).   Plaintiff was also cross-examined regarding the fact that on the day he filed this lawsuit, he also filed six (6) other lawsuits. Yet, Plaintiff was unfamiliar with those suits as well as the businesses involved.   *See* Tr.

---

[11]      Neither party questioned Plaintiff regarding how close he lives to the Property or whether he is even a resident of San Diego County.   However, Plaintiff's Motion for Summary Judgment stated that he lives about ten (10) minutes away from the Property. Langer MSJ Decl. at 3, ¶¶ 15-18 (declaring, under penalty of perjury, that he (1) lives "about 10 minutes away from the Smoke Shop and the Lobster Shop," (2) "would like the ability to safely and independently park and access the Businesses," and (3) plans to vists the business "on a regular basis whenever" he is in the area).   To the extent the proximity of Plaintiff's home to the businesses weighs in favor of an intent to return, the lack of credibility of Plaintiff's alleged intent to return weighs equally against Plaintiff.

[12]      In this case, also before this Court, the defendants moved to dismiss Plaintiff's case by arguing that *res judicata* bars his April 6, 2020 lawsuit because on May 29, 2013, Langer filed essentially the same lawsuit against the same defendants (in addition to a third defendant) in San Diego County Superior Court as Case No. 37-2013-00050784-CL-CR-CTL based on the same alleged violations of the ADA and UCRA with respect to the same property.   *Lapiz* Case, ECF No. 10-1 at 2:4-8.   In response, Plaintiff argued *res judicata* did not preclude his new lawsuit because his ADA claim could not have been brought in the prior lawsuit as "Langer had no intention of returning to the . . . store and, therefore, had no standing to seek ADA injunctive relief."   *Lapiz* Case, ECF No. 11 at 2:16-3:2; *but see* Plaintiff's Motion *in Limine*, ECF No. 66-1 ("MIL"), Ex. A, 116:13-17 (Plaintiff testified during his deposition in this case that with respect to the at least 950 cases he filed in the federal courts, he alleged he intended to return in all of them).   Thus, Plaintiff's assertions in the *Lapiz* Case contradict his testimony in this case that he intends to return in all of his ADA lawsuits.

at 52:18-20, 57:21-24.   During trial, this Court also took judicial notice of the fact that since May 1, 2002, or over the course of the past eighteen (18) years, Plaintiff has been a plaintiff in 1,498 federal lawsuits.   Tr. at 46:5-47:7; *see also* Order on Plaintiff's Motion in Limine, ECF No. 90 at 7:1-2.   This extensive litigation history coupled with Plaintiff's inability to recall details about the businesses involved and allegations made, including whether he intended to return to those businesses, weighs against Plaintiff with respect to the credibility of this professed intent to return.   To the contrary, the Court finds that, at the time he filed suit, Mr. Langer did not intend to return to the Property (at least to purchase lobster).   The Court finds that Plaintiff's purpose in visiting the Property was to identify potential ADA violations, not to actually purchase lobster or patronize the Smoke Shop.

More importantly, a notable issue at trial was whether Plaintiff's presence on the Property constituted a trespass because if it was, it means it was private property rather than a place of public accommodation.   Plaintiff's counsel conceded at trial that if, in fact, no one is permitted to park in the East Lot, there is no ADA violation.   Tr. at 114-115.   The ADA requires that disabled persons have equal access to services as able-bodied persons.   *Id.* at 115:2-6.   In other words, if non-disabled persons cannot park somewhere, that disabled persons also cannot park there does not give rise to an ADA violation.   *Id.*   Plaintiff failed to present evidence showing that (1) Mr. Kiser knew Mr. Taylor had displayed the Lobster Parking Sign at the time Plaintiff visited the Property and did nothing about it (e.g., implicitly consenting to customers parking there) and (2) public parking was permitted in the East Lot.   The Court further finds that given the words "and his guest(s)" was stricken from the Lease Agreement, the intent of the Lease Agreement was that Mr. Taylor and his wife, and no one else, were to park in the designated parking spot.   The numbering of each parking space bolsters this finding by indicating that each space is designated for use by a specific tenant.   These facts indicate that the East Lot was not a place of public accommodation.   To the extent Plaintiff's complaint alleged other ADA violations inside the stores, Plaintiff presented no evidence

-18-

1  at trial regarding those issues and limited his case-in-chief to the issues regarding the lack

2  of a van accessible ramp in the East Lot.  As such, Plaintiff failed to carry his burden of

3  proof as to any other potential ADA violations, and the only allegations he attempted to

4  prove up pertained to the East Lot, which was not a place of public accommodation.

5  **III.   CONCLUSIONS OF LAW**

6         As outlined below, the Court makes the following conclusions of law:

7         1.      On September 19, 2017, or the day of Plaintiff's visit:

8                 a.      Plaintiff qualified as a disabled individual under the ADA and UCRA.

9                 b.      The Lobster Shop store front was open to the public as a place of

10  public accommodation.

11                c.      The East Lot was not a place of public accommodation.

12                d.      The Lease Agreement between Defendants and Mr. Taylor, who

13  owns the Lobster Shop, did not permit Mr. Taylor or the Lobster Shop to have customers

14  park in its designated parking space.

15                e.      To the extent Plaintiff was an invitee of the Lobster Shop, the Lobster

16  Shop only had the authority to invite him into the areas which it had control under

17  pursuant to the Lease Agreement, or in other words, the store front of the Lobster Shop

18  or arguably, parking space number one (even though inviting customers to park in this

19  space violated the Lease Agreement).

20                f.      Because Plaintiff never entered the Lobster Shop storefront or parked

21  in parking space number one while he was in the East Lot, he never entered the area into

22  which the Lobster Shop arguably invited him.

23                g.      Plaintiff's presence within the East Lot constituted a trespass.

24                h.      The Lobster Shop lacked the authority to invite customers into space

25  that was not leased to it under the Lease Agreement (e.g., any space other than parking

26  space number one).

27         2.      Plaintiff has standing to pursue his ADA claims.

28         3.      Plaintiff's sole alleged ADA violation pertaining to the lack of a handicap

-19-

1    access aisle is not moot.

2    These conclusions of law are based on the Court's findings of fact as well as its

3    analysis of the jurisdiction, standing, and merits of this matter, as set forth below.

4    ### A.    ADA Disability Discrimination[13]

5    "An individual alleging discrimination under Title III must show that: (1) he is

6    disabled as that term is defined by the ADA; (2) the defendant is a private entity that

7    owns, leases, or operates a place of public accommodation; (3) the defendant employed

8    a discriminatory policy or practice; and (4) the defendant discriminated against the

9    plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable

10   modification that was (b) necessary to accommodate the plaintiff's disability." *Fortyune*

11   *v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004).

12   In the present case, the Court finds that Plaintiff is disabled as that term is defined

13   by the ADA.  However, even though Defendants are a private entity that leases the

14   Property, the portion of the space they lease at issue in this case (e.g., the East Lot) is not

15   a place of public accommodation.  Given that all members of the general public—not

16   just Plaintiff (or any other disabled individuals)—were denied access to the East Lot,

17   Defendants did not employ a discriminatory policy or practice.   Consequently,

18   Defendants did not discriminate against Plaintiff by (1) failing to make a requested

19   reasonable accommodation that was (2) necessary to accommodate Plaintiff's disability.

20   _____

21   13    The Ninth Circuit has reiterated that courts must assure themselves that the

22   constitutional justiciability requirements, including but not limited to standing, must be satisfied before proceeding to the merits.  *Bates v. United Parcel Serv., Inc.*, 511 F.3d

23   974, 985 (9th Cir. 2007) (referring to standing as "a threshold matter central to our subject matter jurisdiction"); *see also D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031,

24   1035 (9th Cir. 2008) (noting that district courts "are *required* sua sponte to examine jurisdictional issues such as standing") (original emphasis); *Skaff v. Meridien N. Am.*

25   *Beverly Hills, LLC*, 506 F.3d 832, 837 (9th Cir. 2007) (noting that "if a plaintiff does not

26   allege standing in its complaint, we have no jurisdiction to hear the case").  As outlined in further detail in Section III(C) below, the Court determines that it has jurisdiction over

27   Plaintiff's ADA claim pursuant to Article III, as Plaintiff has standing for his ADA claim,

28   which is ripe and not moot.

1  Thus, as outlined below, even if Plaintiff had standing, his allegations fail to establish a

2  violation of the ADA because (1) he was not denied equal access and (2) the East Lot is

3  not a place of public accommodation, whatsoever, as to whether the accommodation he

4  seeks is readily achievable under the law.

5         **1.**    ***Plaintiff Was Not Denied Equal Access.***

6       Plaintiff's alleged violations of the ADA are limited to the East Lot.[14]  However,

7  the evidence at trial confirms the East Lot had numerous signs stating that open parking

8  was prohibited, and parking was for tenants only.  Tr. at 21:1-2 (testifying that Plaintiff

9  believes the signs in Exhibit 4B "say something to the effect of tenant parking only");

10 *see also id.* at 64:18-65:14 (testifying that he interpreted the sign saying "no open public

11 parking" as meaning "customer parking only").  This is bolstered by (1) Mr. Kiser's

12 testimony, Tr. at 97:22-24; (2) the Lease Agreement, which struck out the phrase "or his

13 guest(s)" from the clause addressing parking, Trial Ex. 17; (3) the fact that the parking

14 spaces are numbered, indicating assignment to various tenants, Trial Ex. 4E; and (4) the

15 fact that the arrow on the Live Lobster Sign was pointed to the left as opposed to directly

16 downwards, as one would expect if customers were meant to park in the spot in front of

17 the sign, Trial Ex. 4P.  As such, the East Lot was not a place of public accommodation.

18 *See, e.g.*, *Jankey*, 14 F. Supp. 2d at 1181-82 (holding a lot was not a public place of

19 accommodation where the evidence showed only employees and guests with passes,

20 rather than the general public, could gain access to the Commissary during ordinary

21 business hours even though the plaintiff had occasionally gained entry without a pass).

22      "To maintain an action for damages . . . an individual must take the additional step

23 of establishing that he or she was denied equal access on a particular occasion."  *Boemio*

24 *v. Love's Rest.*, 954 F. Supp. 204, 207 (S.D. Cal. 1997) (Battaglia, J.).  Where all

25 ─────────────

26 [14]    As stated, Plaintiff's complaint initially included allegations about the counter heights in the Lobster Shop and Smoke Shop, Compl. at 5, ¶¶ 31-34, but no evidence was

27 presented at trial regarding those issues.  As such, Plaintiff did not carry his burden of proof by showing violations within either of the store fronts, and the Court limits

28 Plaintiff's allegations to the East Lot.

1    individuals, disabled or nondisabled, are prevented from accessing a facility, no violation

2    of the ADA ensues.  *See, e.g.*, *Good Shepherd Manor Found., Inc. v. City of Momence*,

3    323 F.3d 557, 564 (7th Cir. 2003) (holding that the district court appropriately prevented

4    the plaintiff from proceeding under a reasonable accommodation theory where the

5    plaintiff "presented nothing to suggest that the alleged rules or actions of the city affected

6    the developmentally disabled any differently than they affected all other people").  Here,

7    Plaintiff cannot prove he was denied equal access because Defendants prohibited all

8    individuals who were not tenants, disabled or not disabled, from parking in the East Lot.

9    ### 2.    *The East Lot is Not a Place of Public Accommodation.*

10   Defendants argue that they "did not lease the parking lot to anyone for use as a

11   place of public accommodation," and as a result, "are not liable for any ADA or Unruh

12   Act violations because the parking lot was not a place of public accommodation."  Def.

13   Brief at 2:5-7.  At trial, however, Plaintiff solicited testimony from both Mr. Taylor and

14   Mr. Kiser that despite Defendants' intent to keep the East Lot limited to tenant parking,

15   Mr. Taylor had customers and family park in his designated parking spot.  Tr. at 79:2-

16   14; 81:10-16; 97:20-98:4.

17   As stated, Title III of the ADA's prohibition against discrimination is limited to

18   "any place of public accommodation by any person who owns, leases (or leases to), or

19   operates a place of public accommodation."  42 U.S.C. § 12182(a); *see also Botosan v.*

20   *Paul McNally Realty*, 216 F.3d 827, 833 (9th Cir. 2000) ("The legislative history

21   confirms that a landlord has an independent obligation to comply with the ADA that may

22   not be eliminated by contract.").  "The determination of whether a facility is a 'public

23   accommodation' for purposes of coverage by the ADA turns on whether the facility is

24   open 'indiscriminately to other members of the general public.'"  *Montoya v. City of San*

25   *Diego*, 434 F. Supp. 3d 830, 844 (S.D. Cal. 2020).  Even if non-tenants or customers

26   occasionally parked in the East Lot, as was testified to at trial, "occasional use of an

27   exempt commercial or private facility by the general public is not sufficient to convert

28   that facility into a public accommodation under the ADA."  *Jankey*, 14 F. Supp. 2d at

-22-

1178 (noting that a private club maintaining a "'limited guest policy,' in which guests are not permitted 'unfettered use of facilities,' is not a public accommodation for purposes of the ADA, despite evidence of 'isolated incidents' in which the limited guest policy was not followed"). In "mixed-use" facilities, like Defendants' Property, "where only part of the facility is open to the public, the portion that is closed to the public is not a place of public accommodation and thus is not subject to Title III of the ADA." *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1048 (9th Cir. 2008) (holding that the district court did not err by granting summary judgment to 7-Eleven on the plaintiff's claim that the defendant violated the ADA by excluding him from the employee-only restroom).

In this case, though the Lobster Shop itself qualifies as open to the public, the tenant-only parking lot is not.[15] *Compare* Tr. at 97:22-24 (testifying that the East Lot spaces were not intended for use by the customers of Mr. Kiser's tenants) *with Doran*, 524 F.3d at 1048 ("Though the retail portion of the North Harbor 7-Eleven is open to the public, the employees-only restroom is not.").

### B.    Federal Jurisdiction

Article III of the United States Constitution limits the subject-matter jurisdiction of federal courts to justiciable "cases" and "controversies." U.S. CONST., ART. III, § 2. The United States Supreme Court has held that for a case to meet the justiciability requirements for federal subject-matter jurisdiction jurisdiction, a plaintiff must show (1) standing; (2) that the case is ripe; (3) the case is not moot; and (4) the case does not involve a political question. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006). In this case, this Court has federal jurisdiction over Plaintiff's ADA claim pursuant to

---

[15]     To the extent Plaintiff attempts to argue that the East Lot is a place of public accommodation in that the Property itself is leased to tenants, and if a disabled individual, like Plaintiff, sought to lease from Defendants, that tenant might be inhibited in his or her ability to park in his or her allocated parking space due to the lack of an access aisle, this argument fails because Plaintiff would lack standing. He presented no evidence regarding an intent to lease space from Defendants, only evidence regarding his intent to patronize the Lobster Shop.

-23-

1   Article III, as Plaintiff has standing for his ADA claim, which is ripe and not moot.

2         **1.**    ***Plaintiff Has Standing.***

3         Establishing standing in ADA cases seeking injunctive relief requires the plaintiff

4   to plead (1) a concrete and particularized injury in fact that is both actual or imminent as

5   opposed to conjectural or hypothetical; (2) a causal connection between the alleged injury

6   and the defendant's challenged conduct; (3) a likelihood that a favorable decision will

7   redress that injury, and (4) a sufficient likelihood the plaintiff will be wronged in a similar

8   way by showing a real and immediate threat of repeated injury. *Fortyune*, 364 F.3d at

9   1082.

10         In 2008, the Ninth Circuit reiterated that when determining whether a civil rights

11   litigant has met these requirements, "the Supreme Court has instructed us to take a broad

12   view of constitutional standing[,] especially where, as under the ADA, private

13   enforcement suits are the primary method of obtaining compliance under the Act." *D'Lil*

14   *v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008) (reversing the

15   district court's conclusion that the ADA plaintiff lacked standing) (citing *Doran,* 524

16   F.3d at 1039-40 (quoting *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972));

17   *see also Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 986 (9th Cir. 2007) (concluding

18   that the ADA plaintiff and another class member had satisfied standing requirements for

19   injunctive relief, albeit noting those requirements differed in class actions). Additionally,

20   "motivation is irrelevant to the question of standing under Title III of the ADA." *Civil*

21   *Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1102 (9th Cir. 2017)

22   (holding that the plaintiffs' status as ADA testers did not deprive them of standing). "The

23   actual or threatened injury required by Article III may exist solely by virtue of a statute

24   that creates legal rights, the invasion of which creates standing." *Duffy v. Riveland*, 98

25   F.3d 447, 453 (9th Cir. 1996) (holding the plaintiff had standing under the ADA) (quoting

26   *Greater Los Angeles Council on Deafness, Inc. v. Baldrige*, 827 F.2d 1353, 1357-58 (9th

27   Cir. 1987) (holding that the plaintiffs, as deaf individuals injured directly by the alleged

28   violations of the Rehabilitation Act, had standing to sue)).

-24-

Because the Court lacks jurisdiction to address the merits—such as whether the East Lot even qualifies as a place of public accommodation in the first place or whether Plaintiff was denied access—until it determines Plaintiff has standing, it concludes Plaintiff has standing[16] on the basis that he encountered a barrier on the date of hist visit.

## 2. *Plaintiff's Requested Injunctive Relief Is Ripe.*

Plaintiff failed to present any evidence at trial that the alleged violative condition still exists at the Property or could exist again in the future. For a case to meet Article III's justiciability requirements, it "must be 'ripe'[17]—not dependent on 'contingent future

---

[16]    The Court arrives at this conclusion reluctantly, and only does so by following the Ninth Circuit's instructions to liberally construe standing in ADA cases. However, a critical aspect of standing in ADA cases is the legitimacy of the plaintiff's intent to return to the business sued. *See, e.g.*, *Harris*, 472 F. Supp. 2d at 1215-16 (noting that "b]oth actual, injury, which includes deterrence and causation in its definition, and imminent injury, which includes threat of future harm, require, at the very least, that a plaintiff be likely to return to patronize the accommodation in question"). This requires proving not only knowledge of the barriers at the defendant's business but also intent to return in the "imminent future" (rather than some day) but for the barriers described. *Id.* at 1216 (holding that the plaintiff lacked standing "because, as of the date of filing, Mr. Harris was not likely to return to the Shell station"). The Ninth Circuit has utilized a four-part test to analyze an ADA plaintiff's intent to return sufficient to establish a likelihood of future injury, which evaluates the (1) proximity of the place of the public accommodation to the plaintiff's residence, (2) plaintiff's past patronage of the defendant's business, (3) definitiveness of plaintiff's plans to return, and (4) plaintiff's frequency of travel near defendant. *Mandarin Touch II*, 385 F.Supp.2d at 1045. As noted in the Court's Analysis, at trial, Plaintiff failed to present any evidence on any of these issues. Thus, the Court seriously doubts Plaintiff had a legitimate intent to return sufficient to confer standing. However, the evidence relevant to the standing inquiry consists of "the facts as they existed at the time the plaintiff filed the complaint." *D'Lil*, 538 F.3d at 1036. Although the Court finds Plaintiff's testimony was both not credible and also rehearsed, he nonetheless stated he intended to return both in his complaint as well as at trial. Given the Court's ultimate conclusion that Plaintiff failed to carry his burden of proving a *prima facie* case of disability discrimination under the ADA, the Court's finding that Plaintiff has standing does not change the outcome of this case: Plaintiff does not prevail either way.

[17]    The United States Supreme Court has "cast doubt on the prudential component of ripeness" as creating tension with "the principal that a federal court's obligation to hear

---

events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  This is because the role of federal courts "is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Skyline*, 968 F.3d at 746.

"The constitutional component of ripeness often overlaps with the injury-in-fact prong of Article III standing." *Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007).  Courts have insinuated, but not explicitly held, that so long as a plaintiff shows a sufficient injury to establish Article III standing, any remaining prudential ripeness concerns should not render a plaintiff's claim nonjusticiable.  *See, e.g.*, *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018) (declining to address "the continuing vitality of the prudential ripeness doctrine" because that the plaintiffs had failed to establish the constitutional component of ripeness).  Thus, whether a court frames the justiciability question in terms of standing or ripeness makes no difference to the resolution of the case.  *See, e.g.*, *Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1138-39 (9th Cir. 2000) (en banc) ("Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.'") (quoting *Ry. Mail Ass'n v. Corsi,* 326 U.S. 88, 93 (1945)).

In this case, Defendants never offered public parking in the East Lot, including when Plaintiff visited the Property, arguably rendering the injunction Plaintiff seeks

---

and decide cases within its jurisdiction is virtually unflagging."  *Skyline Wesleyan Church v. California Dep't of Managed Health Care*, 968 F.3d 738, 751, n. 9 (9th Cir. 2020), quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014).  Because the Supreme Court "has not yet had occasion to 'resolve the continuing vitality of the prudential ripeness doctrine,'" this Court, like other courts, continues to apply it in spite of the uncertainty regarding its life expectancy.  *Id.*

unripe as Plaintiff has not been and is not denied equal access. Plaintiff, however, argues that the Lobster Shop could offer parking to its customers at any time after the conclusion of this lawsuit, and he would again be denied equal access to parking. Pltff. Brief. at 12:14-15. He continues that "[g]iven the transitory nature of this 'fix,' the only way to prevent recurrence is to issue an injunction requiring the defendants to provide accessible parking to the extent they provide customer parking." *Id.* at 12:16-18. Plaintiff contends "[s]uch an order will not require Defendants to provide any customer parking," but it will require that if parking is offered to customers, it will be ADA complaint. *Id.* at 12:18-19. Although the Court finds this argument tenuous as pertaining to a hypothetical future scenario (e.g., the opening of the East Lot to the public), it concludes the issue is ripe for review in light of authority holding that ripeness is satisfied where a plaintiff has standing. *Thomas,* 220 F.3d at 1138-39.

### 3.     *Plaintiff's ADA Claim is not Moot.*

Defendants argue in their post-trial brief that Plaintiff's claims are moot because Plaintiff concedes the Lobster Shop "has ceased allowing its parking spaces to be used by customers." Def. Brief at 2:9-11. Plaintiff responds that even though the Lobster Shop "has ceased offering parking to its customers, this act is not sufficient to moot Mr. Langer's ADA claims as it does not preclude the store from simply reopening its parking at the conclusion of this case." Pltff. Brief at 2:10-13, 11:2-4. He elaborates that "[h]ad the violation been the lack of a wheelchair ramp and had the defendants installed a permanent concrete wheelchair ramp, they would have an excellent argument for mootness" because "there is no chance of future violations." *Id.* at 11:13-15. However, Plaintiff contends that "[i]n the present case, the defendants' parking is in the same physical condition as when Mr. Langer encountered it." *Id.* at 11:16-17. This contradiction in Plaintiff's own testimony goes to Plaintiff's credibility. On the contrary, the Declaration of Zion Sapien in Support of Plaintiff's Motion for Summary Judgment,[18]

---

[18]     In Paragraph 5 of his declaration, Mr. Sapien even states that on the date of his

-27-

showed a photograph taken of Defendants' Property from September 10, 2018 at 4:16 p.m., in which Defendants had created a handicap access aisle to the right of the designated handicap spot in their parking lot.  *See* Sapien Decl., ECF No. 24-6 at 2, ¶¶ 3-5 (declaring that Exhibit 6 is a true and accurate copy of the photograph he took on September 10, 2018); *see also* ECF No. 24-7 at 3 (Exhibit 6 to Mr. Sapien's declaration).

"If the issues are no longer live or the parties lack a legally cognizable interest in the outcome, then there is no controversy and the case is moot."  *Hillesheim v. O.J.'s Cafe, Inc.*, 968 F.3d 866, 868 (8th Cir. 2010) (noting that "[i]n the context of the ADA, 'permanent physical improvements ... are sufficient to eliminate a case or controversy if they provide the requested relief.'"); *but see Kohler v. Islands Restaurants, LP*, 956 F. Supp. 2d 1170, 1173 (S.D. Cal. 2013) (Whelan, J.) (denying motion for summary judgment where a genuine issue of fact remained as to whether the parking spaces had been fully remedied).  However, "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."  *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" unless the defendant meets the heavy burden of showing that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not be reasonably expected to recur.").  Accordingly, "[v]oluntary cessation of an illegal course of conduct does not render moot a challenge to that course of conduct unless (1)

---

visit, "there was one parking space reserved for persons for disabilities with an adjacent access aisle."  Sapien Decl., ECF No. 24-6 at 2, ¶ 5.  While Mr. Sapien stated the access aisle did not have "NO PARKING" lettering, Plaintiff did not raise the lack of "NO PARKING" lettering at trial as an alleged ADA violation, only the absence of an access aisle, which according to Mr. Sapien, was remedied.  *Id.*  While neither party called Mr. Sapien as a witness at trial, the Court finds his testimony relevant as it is part of the record and contradicts testimony given at trial, shedding light on credibility.

-28-

1  there is no reasonable expectation that the wrong will be repeated, and (2) interim relief

2  or events have completely and irrevocably eradicated the effects of the alleged

3  violation." *Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992) (citing *County of Los*

4  *Angeles v. Davis,* 440 U.S. 625, 631 (1979); *DeFunis v. Odegaard,* 416 U.S. 312, 318

5  (1974) (per curiam)).

6       Here, because the Lobster Shop could offer parking to customers again, even in

7  contravention of the private status of the East Lot, the controversy could arise again.

8  Thus, the Court finds the issue is not moot, allowing the Court to proceed to the merits.

9       **C.   Supplemental Jurisdiction**

10      Even where a plaintiff establishes standing such that the court's exercise of

11  jurisdiction over federal claims is appropriate, the court retains discretion over whether

12  to exercise supplemental jurisdiction over related state law claims pursuant to 28 U.S.C.

13  § 1367(a).   *See, e.g.*, *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 421 (9th Cir. 1991)

14  ("Pendent jurisdiction [over state law claims] exists where there is a sufficiently

15  substantial federal claim to confer federal jurisdiction, and a common nucleus of

16  operative fact between the state and federal claims.")   District courts may decline to

17  exercise supplemental jurisdiction over related claims where (1) the related "claim raises

18  a novel or complex issue of State law," (2) "the claim substantially predominates over

19  the claim or claims over which the district court has original jurisdiction," (3) "the district

20  court has dismissed all claims over which it has original jurisdiction," or (4) "in

21  exceptional circumstances, there are other compelling reasons for declining jurisdiction."

22  28 U.S.C. § 1367(c).   "The decision to retain jurisdiction over state law claims is within

23  the district court's discretion, weighing factors such as economy, convenience, fairness,

24  and comity." *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995).   Further, district courts

25  do not need to "articulate why the circumstances of [the] case are exceptional" to dismiss

26  state-law claims pursuant to 28 U.S.C. section 1367(c)(1)-(3).   *San Pedro Hotel Co., Inc.*

27  *v. City of L.A.*, 159 F.3d 470, 478-79 (9th Cir. 1998)).

28      Where a plaintiff brings related state law claims in federal court, as is the case

-29-

here, courts must balance the efficiency of exercising supplemental jurisdiction over related state law claims caused by the preservation of judicial resources with the principles of comity and fairness. *See, e.g.*, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (noting that where "state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals"). However, comity represents a valid reason for district courts to decline exercising supplemental jurisdiction where a case involves strong reasons to have state courts interpret state law or the plaintiff has engaged in forum shopping. *Org. for Advancement of Minorities with Disabilities v. Brick Oven Rest.*, 406 F. Supp. 2d 1120, 1132 (S.D. Cal. 2005). As outlined below, the Court finds the principles of comity justify this court in declining supplemental jurisdiction.

### 1. *Plaintiff's UCRA Claim*

Since the 2017 decision in *Schutza v. Cuddeback*, 262 F. Supp. 3d 1025, declining the exercise of supplemental jurisdiction over related state law claims in an ADA case, the tide has changed and over 931 cases have favorably cited the decision rejecting supplemental jurisdiction. *Langer v. Honey Baked Ham, Inc.*, No. 3:20-CV-1627-BEN-AGS, 2020 WL 6545992, at *7 (S.D. Cal. Nov. 6, 2020). As a result, almost every district judge in the Southern District has declined to exercise supplemental jurisdiction over supplemental state law claims in similar cases alleging violations of the ADA and UCRA. *See id.* (collecting cases). Thus, courts within this district agree that they should decline supplemental jurisdiction where a plaintiff appears to be filing suit in federal court for the purpose of circumventing California state law.

As detailed below, in accordance with this district, this Court declines exercising supplemental jurisdiction over Plaintiff's UCRA claim because (1) state law issues predominate, (2) comity favors having the state court exercise jurisdiction over the state law claims, and (3) compelling interests favor discouraging forum-shopping.

First, in light of the remedies provided under the federal and state laws, the state

-30-

law claims predominate.  Plaintiff's claims arising under California's UCRA provide more expansive remedies than the claims brought under the ADA, and Plaintiff is pursuing remedies under both laws.  For example, California provides greater protection than the ADA by allowing recovery of money damages, *see Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1131 (9th Cir. 2002), while "the only remedy available under the ADA is injunctive relief," *see Feezor v. Tesstab Operations Group, Inc.*, 524 F. Supp. 2d 1222, 1224-25 (S.D. Cal. 2007) (Lorenz, J.); *Wander v. Kaus,* 304 F.3d 856, 858 (9th Cir. 2002).  As a result, the UCRA substantially predominates over the ADA claim because the ADA claim "appears to be a second claim included to justify filing the complaint in this Court, rather than a necessary (let alone predominant) claim in this lawsuit." *Brooke v. Crestline Hotels & Resorts LLC.*, No. 20-cv-301-CAB-AGS, 2020 U.S. Dist. LEXIS 34001, at *3 (S.D. Cal. Feb. 25, 2020).

Second, comity favors declining supplemental jurisdiction because the federal and state law claims may require different proof, and the state law claims are subject to a heightened pleading standard.  "[I]n 1992, the California Legislature amended California Civil Code Section 51 and added a provision that a defendant violates the Unruh Act whenever it violates the ADA." *Feezor*, 524 F.Supp.2d at 1224-25 (citing Civ. Code § 51(f).  However, an important distinction between the federal and state law claims is that while a violation of the ADA does not require intentional discrimination, a claim under the UCRA may require such an intent.  *Schutza v. McDonald's Corp.*, 133 F. Supp. 3d 1241, 1247 (S.D. Cal. 2015) (Hayes, J.).  Thus, intent to discriminate would only be relevant to the Plaintiff's UCRA discrimination claims and would require application of state law standards.  *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 846 (9th Cir. 2004).  "When federal courts consider claims under state law, they are to apply federal procedural law and state substantive law." *O'Campo v. Chico Mall, LP*, 758 F.Supp.2d 976, 984-85 (E.D. Cal. 2010) (citing *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938)).  Here, given various issues of proof require application of state law, comity favors having a state court, familiar with such

-31-

1    standards, resolve those issues.

2        Third, compelling interests of comity as well as discouraging forum shopping

3    support this Court's decision to decline exercising supplemental jurisdiction over the

4    UCRA claims.  *See Gibbs*, 383 U.S. at 726 (holding that comity is a factor to be

5    considered before exercising supplemental jurisdiction).  "California has a strong interest

6    in protecting its citizens and businesses from abusive litigation and also in preventing its

7    own laws from being misused for unjust purposes."  *Brooke v. Suites LP*, No. 3:20-CV-

8    01217-H-AHG, 2020 WL 6149963, at *5-6 (S.D. Cal. Oct. 19, 2020) (Huff, J.) (declining

9    supplemental jurisdiction over the plaintiff's UCRA claim "because it substantially

10   predominates over her federal claim under the ADA and exceptional circumstances favor

11   dismissal, including the Court's interests in comity and discouraging forum-shopping").

12   By filing in federal court without complying with California's heightened pleading

13   requirements[19] for claims under the UCRA, as would be required had Plaintiff filed suit

14   in state court, Plaintiff appears to be forum shopping.  *See, e.g.*, *Cuddeback*, 262 F. Supp.

15   3d at 1027-32 (reasoning that "[a]s a high-frequency litigant primarily seeking relief

16   under state law, the Court finds it would be improper to allow Plaintiff to use federal

17

---

18   19    "In 2012, California adopted heightened pleading requirements for disability
     discrimination lawsuits under the Unruh Act, including provisions requiring high-
19   frequency litigants to verify and specify their allegations."  *Cuddeback*, 262 F. Supp. 3d
     at 1031-32 (citing CAL. CODE CIV. PROC. § 425.50).  Under this standard, "[e]xcept in
20   complaints that allege physical injury or damage to property, a complaint filed by or on
     behalf of a high-frequency litigant" must state: (1) "[w]hether the complaint is filed by,
21   or on behalf of, a high-frequency litigant"; (2) "the number of complaints . . . alleging a
     construction-related accessibility claim that the high-frequency litigant has filed during
22   the 12 months prior to filing the complaint"; and (3) "the reason the individual was in the
     geographic area of the defendant's business."  CAL. CODE CIV. PROC. § 425.50(a)(4); *see
23   also* CAL. CODE CIV. PROC. § 425.55(b) (defining "high-frequency litigant" as either a
     plaintiff or attorney "who has filed 10 or more complaints alleging a construction-related
24   accessibility violation within the 12-month period immediately preceding the filing of
     the current complaint alleging a construction-related accessibility violation").  "The
25   purpose of these heightened pleading requirements is to deter baseless claims and
     vexatious litigation."  *Cuddeback*, 262 F. Supp. 3d at 1031.

26

27

28

court as an end-around to California's pleading requirements" by exercising supplemental jurisdiction). *Id.* "It is unclear what advantage—other than avoiding state-imposed pleading requirements—Plaintiff gains by being in federal court since his sole remedy under the ADA is injunctive relief, which is also available under the Unruh Act." *Id.* (citing *Hanna v. Plumer*, 380 U.S. 460, 467-68 (1965) (providing that federal courts may take measures to discourage forum-shopping); *see also Brick Oven Rest.*, 406 F. Supp. 2d at 1132 ("Because a legitimate function of the federal courts is to discourage forum shopping and California courts should interpret California law . . . compelling reasons exist to decline supplemental jurisdiction over plaintiff's state law claims.").

Here, Plaintiff's complaint failed to include allegations by Plaintiff and his counsel regarding their status as high-volume litigants that would have otherwise been required under California law. *See generally* Compl. Accordingly, the Court, questions the propriety of exercising supplemental jurisdiction over the state law claims where Plaintiff has failed to comply with California's heightened pleading requirements for high-volume litigants, like Plaintiff. Given Plaintiff could seek the more rewarding remedies (e.g., money damages) in state court as well as injunctive relief (the only relief available in federal court), filing in federal court seems to be strategic avoidance of the heightened-pleading requirements that would otherwise need to be met in state court. *See, e.g.*, *Schutza v. Alessio Leasing, Inc.*, No. 18CV2154-LAB (AGS), 2019 WL 1546950, at *4 (S.D. Cal. Apr. 8, 2019) (Burns, J.) (noting that "there is no relief available to Schutza in federal court that could not be secured in state court").

Thus, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims brought under the UCRA and dismisses those claims *without prejudice* to Plaintiff re-filing them in state court. *See, e.g.*, *Molski v. Foster Freeze Paso Robles*, 267 F. App'x 631, 633 (9th Cir. 2008) (noting that if a court declines to exercise supplemental jurisdiction over state law claims, it must dismiss those claims without prejudice).

### 2.   *Defendants' Counterclaim for Trespass*

In light of the Court's decision to decline supplemental jurisdiction over Plaintiff's

-33-

1  UCRA claim, the Court likewise declines supplemental jurisdiction over Defendants'

2  counterclaim for trespass.  Defendants' counterclaim raises issues of state law that,

3  although not novel or complex, differ in terms of the relief available and proof.[20]

4  **IV.  <u>CONCLUSION AND ORDER</u>**

5  Based upon the above findings of fact and conclusions of law, the Court orders

6  that the Clerk of the Court enter judgment as follows:

7  1.  Plaintiff failed to carry his burden of proof as to the ADA claim because the

8  East Lot is not a place of public accommodation, and even if it was, Plaintiff was not

9  denied equal access.  Defendants are the prevailing party as to the ADA claim, and the

10  Clerk of the Court shall enter judgment in their favor.  *See, e.g.*, FED. R. CIV. P. 54(d)(1)

11  (allowing courts to award costs to the prevailing party in a case); *CRST Van Expedited,*

12  *Inc. v. E.E.O.C.*, 136 S. Ct. 1642, 1651 (2016) (holding "that a defendant need not obtain

13  a favorable judgment on the merits in order to be a 'prevailing party'" and "has . . .

14  fulfilled its primary objective whenever the plaintiff's challenge is rebuffed"); 42 U.S.C.

15

16  20  "Trespass is an unlawful interference with possession of property." *Staples v.*
17  *Hoefke*, 189 Cal. App. 3d 1397, 1406 (1987).  "The elements of trespass are: (1) the
     plaintiff's ownership or control of the property; (2) the defendant's intentional, reckless,
18  or negligent entry onto the property; (3) lack of permission for the entry or acts in excess
     of permission; (4) harm; and (5) the defendant's conduct was a substantial factor in
19  causing the harm." *Ralphs Grocery Co. v. Victory Consultants, Inc.*, 17 Cal. App. 5th
20  245, 262 (2017), *as modified* (Nov. 6, 2017).  Thus, for instance, while the ADA does
     not require proof of intent to discriminate, *McDonald's*, 133 F. Supp. 3d at 1247, trespass
21  requires "intentional, reckless, or negligent entry onto a property," as well as proof of
22  harm.  *Ralphs*, 17 Cal. App. 5th at 262.  That being said, in terms of liability for
     trespassing, only intent to enter the property, but not intent to trespass, is relevant: So
23  long as an individual intends to enter the property, he or she will be held liable for
24  trespassing even if he or she lacked knowledge of the fact that he or she was trespassing.
     *Richards v. Dep't of Bldg. Inspection of City & Cty. of San Francisco*, No. 20-CV-01242-
25  JCS, 2020 WL 3892859, at *6 (N.D. Cal. July 10, 2020).  The facts of this case indicate:
26  (1) Defendants owned the Property; (2) Plaintiff intentionally entered the East Lot; and
     (3) Defendants did not consent to this entry.  Tr. at 8:21-22; 13:19-22, 19:14-20:3, 31:24-
27  32:23, 41:17-23.  However, because the Court has declined the exercise of supplemental
28  jurisdiction, the Court makes no conclusion as to Plaintiff's liability for trespass.

1   § 12205 (providing that in an ADA action, "the court . . . in its discretion, may allow the

2   prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs").

3       2.    The Court declines the invitation to exercise supplemental jurisdiction over

4   Plaintiff's UCRA state law claim and Defendants' counterclaim for trespass arising under

5   California law.  Accordingly, these claims are **DISMISSED *WITHOUT PREJUDICE***.

6       **IT IS SO ORDERED.**

7   DATED:  February 1, 2021          _____

8                           **HON. ROGER T. BENITEZ**

                        United States District Judge